J-S67014-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| MIRAUM MIRANDIS BEY, | : | |
| | : | |
| Appellant | : | No. 269 WDA 2014 |

Appeal from the Judgment of Sentence January 6, 2014,
Court of Common Pleas, Allegheny County,
Criminal Division at No. CP-02-CR-0007338-2013

BEFORE: DONOHUE, MUNDY and FITZGERALD*, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED NOVEMBER 25, 2014**

Miraum Mirandis Bey ("Bey") appeals from the January 6, 2014 judgment of sentence entered by the Allegheny County Court of Common Pleas. On appeal, Bey raises two evidentiary challenges and further claims that his sentence is illegal. Upon review, we conclude that the alleged evidentiary errors do not entitle him to a new trial but agree that his sentence is illegal. We therefore vacate the judgment of sentence and remand for resentencing.

The record reflects the following information adduced at trial. On March 28, 2013, 16-year-old B.G. ("the victim") went with her 17-year-old sister, B.G., to Julia Vidal's house to drink alcohol. There were between five and eight other teenagers and young adults there. After consuming several shots of alcohol, the victim remembered being on the steps of the house,

*Former Justice specially assigned to the Superior Court.

sitting on Bey's lap and kissing him. She felt intoxicated. The next thing she remembered was waking up naked and alone on the floor in a third-floor bedroom of the house. She did not remember undressing. There was a mattress on the floor next to her and vomit on her clothing, which were on the floor.

According to B.G., she walked into the third-floor bedroom and saw the victim laying on the mattress on her back with Bey on top of her "thrusting" "like when you have sex." N.T., 10/23-24/13, at 81. She heard the victim "screaming." *Id.* at 82. B.G. yelled at Bey and tried to pull him off her sister without success. She then retrieved several young men who were at the party to help her. They went upstairs, pulled Bey off the victim, and took him to a second-floor room, where they beat up Bey until Vidal intervened and stopped the fight.

The victim's mother received a call from a family friend whose children were also at the party informing her that the victim had been raped. She went to Vidal's house, picked up the victim and then called the police. When the police officers arrived at the house, they observed the victim to be crying and shaking. She did not respond to questions asked by one of the officers who initially responded to the call. B.G. gave police a summary of what occurred, during which the victim began to become more upset and cry harder. The responding officers contacted the police department's sexual assault unit, which took over the investigation of the case.

Following the advice of the police, the victim's mother then took her to the hospital where a sex assault kit was utilized. Swabs of her vagina, rectum, cervix and labia all tested positive for the presence of "seminal material." *Id.* at 221. Bey's sperm was found on the victim's labia. "[H]e could not be excluded as a contributor" of the seminal material found in the other swabbed areas. *Id.* at 228-29.

The victim met with Detective Tamara Hawthorne of the City of Pittsburgh's Sex Assault Unit. Prior to interviewing the victim, Detective Hawthorne observed the victim in the waiting room – she was curled up on a chair coloring with crayons in a coloring book as a toddler or young child would. She testified that she is not a trained psychologist, but based on her observations she believed the victim was "mentally delayed." *Id.* at 245. She described the victim as "child-like" during the interview, and Detective Hawthorne used techniques to build a rapport with her that she usually used with young children.

Detective Hawthorne testified at trial, detailing her investigation of the sexual assault against the victim. The information she obtained during her interviews with some of the witnesses differed in some respects. One such difference that is of particular relevance to this appeal is that although B.G. did not testify that Bey said anything when he was pulled him off the victim, she reportedly told Detective Hawthorne he said: "Man, I didn't bust a nut in her. I didn't bust a nut in her." *Id.* at 254.

The victim's mother testified that the victim is diagnosed with both Asperger's Syndrome and Attention Deficit Hyperactivity Disorder ("ADHD"). She takes medication to manage her diagnoses and sees a therapist monthly. According to her mother, the victim is not mentally incompetent or mentally challenged, but requires things to be explained slowly and in more detail when you are talking to her.

The victim's mother further testified that the victim has never had a boyfriend or brought a boy to her house. Her mother has only heard her say that a boy is "cute," but nothing more. *Id.* at 302. The victim and her mother reportedly talked a lot, and her mother believed the victim was very open with her. The victim has never spoken with her mother about sex or dating.

Bey testified in his own defense. He stated that he was socializing with the victim that night and although she was drinking, he did not think that she was drunk. He testified that she sat on his lap and they talked for 15 to 20 minutes, and then started kissing on the steps. When someone suggested that they go upstairs, Bey said the victim wanted to and led him by the hand upstairs. Bey admitted that they had sex, but testified that it was consensual. He recalled B.G. coming upstairs, but stated he and the victim were no longer having sex at that time and denied that she tried to pull him away from the victim. According to Bey, B.G. was angry about him being with her sister and started calling for people. The victim asked him to

stay, but Bey did not want to be in the middle of anything. He said he went downstairs to the second floor, where multiple people beat him up, and then he left the house.

After three days of testimony, the jury returned a verdict convicting Bey of unlawful contact with a minor and corruptions of minors.[1] The jury acquitted him of rape by forcible compulsion, rape of an unconscious person and sexual assault.[2] On January 6, 2014, the trial court sentenced Bey to 9 to 18 years of incarceration for his conviction of unlawful contact with a minor. It imposed no additional penalty for his corruption of minors conviction. Bey filed a timely motion to modify his sentence on January 10, 2014, challenging, *inter alia*, the grading of his unlawful contact with a minor conviction as a first-degree felony instead of a third-degree felony. The trial court denied the motion on January 14, 2014. Bey filed a timely notice of appeal, followed by a concise statement of errors complained of on appeal. The trial court filed a written opinion pursuant to Pa.R.A.P. 1925(a) on May 29, 2014.

Bey raises two issues on appeal for our review:

1. Was the 9-to-18 year confinement sentence imposed on [Bey] on [his corruption of minors conviction] an illegal sentence that must be vacated given that (A) [Bey] was acquitted of Felony I Forcible Rape, Felony I Rape of an Unconscious Person, and Felony II

---

[1] 18 Pa.C.S.A. §§ 6318(a)(1), 6301(a)(1)(i).

[2] 18 Pa.C.S.A. §§ 3121(a)(1), (3), 3124.1.

- 5 -

> sexual Assault; (B) 18 Pa.C.S. § 6138(b) and *Commonwealth v. Reed*, 9 A.3d 1138 (Pa. 2010), provide that an Unlawful Contact conviction is in such a circumstance to be graded as a Third[-]Degree Felony; and (C) the most severe punishment that can be imposed for such a felony is, pursuant to 18 Pa.C.S. § 1103(3) and 42 Pa.C.S. § 9756(b)(1), a sentence of 3½-to-7 years of imprisonment?

> 2. Did the [t]rial [c]ourt err when it permitted Pittsburgh Police Detective Tamara Hawthorne to testify (A) that the complainant was, in her estimation, 'mentally delayed,' and (B) that prosecution witness B.G. had told her that [Bey] had said 'I didn't bust a nut in her' (referring to the complainant), rather than saying no words at all, immediately after he was pulled off of the complainant (with the former statement being inadmissible as lay opinion testimony, and the latter statement being precluded since, *inter alia*, the witness was never asked about the alleged prior inconsistent statement)?

Bey's Brief at 3.

Beginning with the first issue raised, it is uncontested by both the trial court and the Commonwealth that Bey's sentence for his conviction of unlawful contact with a minor is illegal. **See** Trial Court Opinion, 5/29/14, at 2-3; Commonwealth's Brief at 6. We agree.[3]

The unlawful contact with a minor statute provides that a conviction shall be graded as either "(1) an offense of the same grade and degree as

---

[3] The proper grading of [a] convicted offense is an issue of statutory interpretation by which we determine the lawfulness of the sentence imposed. As it is purely a question of law, our scope of review is plenary, and our standard is *de novo*. **Commonwealth v. Reed**, 9 A.3d 1138, 1142 (Pa. 2010).

- 6 -

the most serious underlying offense in subsection (a) for which the defendant contacted the minor; or (2) a felony of the third degree; whichever is greater." 18 Pa.C.S.A. § 6318(b). As stated above, the jury acquitted Bey of all of the Chapter 31 crimes for which he was charged – rape by forcible compulsion, rape of an unconscious person, and sexual assault. **See** Verdict Slip, 10/23/13. Pursuant to the corruption of minors statute and our Supreme Court's holding in **Commonwealth v. Reed**, his conviction must therefore be graded as a third-degree felony. 18 Pa.C.S.A. § 6318(b); **Reed**, 9 A.3d at 1147-48. The maximum sentence for a third-degree felony is seven years of imprisonment. 18 Pa.C.S.A. § 1103(3). As such, his sentence of 9 to 18 years of imprisonment is illegal. **See Commonwealth v. Spruill**, 80 A.3d 453, 461 (Pa. 2013) ("The classic instance of an illegal sentence is where the term imposed exceeds the statutory maximum[.]"). "An illegal sentence must be vacated." **Commonwealth v. Melvin**, ___ A.3d ___, 2014 WL 4100200, *40 (Pa. Super. Aug. 21, 2014) (citation omitted). We therefore vacate the judgment of sentence and remand the case for resentencing.

We turn now to Bey's second issue challenging two evidentiary rulings made by the trial court. The trial court asserts that because the sentence issued is illegal, "[the evidentiary challenges] need not be addressed until an appeal, if any, of the resentence." Trial Court Opinion, 5/29/14, at 3. Bey asserts that this Court should review his second issue at this juncture, as his

success on these claims would warrant a new trial, rendering a resentencing hearing unnecessary. Bey's Brief at 31-32. Bey is correct, and thus, in the interest of judicial economy, we will review Bey's second issue.[4]

We review a trial court's decision to admit or exclude evidence according to the following well-settled standard:

> Admission of evidence is a matter within the sound discretion of the trial court, and will not be reversed absent a showing that the trial court clearly abused its discretion. Not merely an error in judgment, an abuse of discretion occurs when the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence on record.

***Commonwealth v. Akbar***, 91 A.3d 227, 235 (Pa. Super. 2014) (citation omitted).

Bey first argues that the trial court abused its discretion by overruling his objection to Detective Hawthorne's testimony that she believed the victim was "mentally delayed." Bey's Brief at 41-45; ***see*** N.T., 10/23-24/13, at 245. Bey asserts that Pennsylvania Rule of Evidence 701, concerning opinion testimony by lay witnesses, bars this testimony, as she "not only testified about the behaviors that she saw the complainant exhibit, but also the medical conclusion that should be drawn from them – i.e., that she was 'mentally delayed.'" Bey's Brief at 41, 44.

---

[4] Because the trial court's reasoning for overruling Bey's objections to the complained-of testimony appears in the record, we need not remand for the filing of a supplemental trial court opinion.

The record reflects that Detective Hawthorne testified to her first encounter with the victim, which occurred in the waiting room of the police station. She observed the teen curled upon a chair, coloring with crayons in a coloring book. N.T., 10/23-24/13, at 243. She stated that this reminded her of the behavior of a toddler or a six-year-old child. *Id.* The victim did not make eye contact with the detective when she spoke with her, and only when Detective Hawthorne told her she could bring the coloring materials with her into the interview room did she comply with the detective's request to accompany her there, grabbing the entire box of crayons and the coloring book to bring with her. *Id.* at 243-44. According to Detective Hawthorne, The victim was "delighted" and "thrilled" to be able to bring the coloring supplies. *Id.* at 244.

Detective Hawthorne indicated that this interaction occurred before she knew of the victim's diagnoses, and testified that although she is not a "trained psychologist," she believed "this child was mentally delayed." *Id.* at 245. Counsel for Bey objected to this statement as "expert testimony," which the trial court overruled, finding that Detective Hawthorne was "testifying as to her observations, not as an expert." *Id.* Detective Hawthorne then continued with her testimony, describing the victim's behaviors and affect during the interview as "child-like." *Id.* at 248, 250.

Rule 701 provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Pa.R.E. 701.

We agree with the trial court that this was not expert testimony and that Detective Hawthorne was simply testifying to her impression of the victim upon seeing her in the waiting room. Detective Hawthorne expressly couched her testimony as her lay impression, prefacing her comment by stating that she was not a psychologist. The testimony she provided thereafter further confirmed the trial court's finding that Detective Hawthorne was testifying to her impression of the victim, as the victim continued to behave in a "child-like" manner during the interview.

As Bey acknowledges, Detective Hawthorne's testimony that the victim appeared to her to be "mentally delayed" is "a lay person's form of expression, not being one that a medical expert would use[.]" Bey's Brief at 44. Although Bey goes on to state his belief that the testimony nonetheless "state[s] a medical and/or psychological conclusion of mental abnormality and mental deficiency," he fails to recognize the context in which the testimony was provided. As stated above, Detective Hawthorne clearly

testified in terms of an observation, her perception, rationally based upon seeing the 16-year-old victim behave in such a child-like manner in the waiting room. Indeed, the victim's mother testified that the victim is not mentally incompetent or mentally challenged in any respect, but that "she doesn't act like an average 16[]year old" and is more child-like. N.T., 10/23-24/13, at 287-88, 289, 300.

Detective Hawthorne's testimony also provided context for the jury to explain the detective's methods of interviewing the witness in a more child-friendly manner than might have been expected for a 16 year old. The detective testified that she permitted the victim to bring her coloring materials into the interview room, and when the victim did not initially respond to Detective Hawthorne's interview questions, the detective began to color along with the victim in an attempt to build a rapport with her, much as you would with a young child. *See id.* at 246-47.

Detective Hawthorne further testified that in her ample experience interviewing children, she has found that they "always have trouble with time. When you have a child victim, they can blend events on top of each other. That is so common. It is like a day lasts forever." *Id.* at 250. Based upon her observations of the victim and her difficulty describing the timeframe of when the alleged sexual assault occurred, Detective Hawthorne testified that in her experience, this was not surprising because of the victim's "child-like […] mental capacity." *Id.* at 249-50.

Detective Hawthorne's testimony of her belief that the victim was "mentally delayed" was rationally based on her perception of the victim, helpful for the jury to understand Detective Hawthorne's testimony, and was not based on knowledge reserved for an expert. *See* Pa.R.E. 701. In the context in which it was presented, the testimony was not stated as a medical diagnosis or conclusion, nor could it be viewed as such from this witness. Thus, we find no abuse of discretion in the trial court's decision to overrule Bey's objection and permit the testimony.

The second evidentiary challenge advanced by Bey is based upon Detective Hawthorne's testimony that B.G., during her interview with Detective Hawthorne, stated that when Bey was pulled off the victim, he said: "Man, I didn't bust a nut in her. I didn't bust a nut in her." Bey's Brief at 45; *see* N.T., 10/23-24/13, at 254. The trial court overruled his objection to this testimony, finding that it was admissible as a prior inconsistent statement made by B.G. N.T., 10/23-24/13, at 253-54. Bey asserts that this was an abuse of discretion, as B.G. was not asked during her testimony about this prior statement or provided with the opportunity to adopt, deny, or explain the statement. Bey's Brief at 45. Rather, when B.G. testified that Bey said nothing when he was pulled off the victim, the Commonwealth did not confront her with this prior statement, which was not made under oath, written and adopted by B.G., or recorded by any means, and thus inadmissible through Detective Hawthorne as hearsay. *Id.* at 45-52.

Pennsylvania Rule of Evidence 802 precludes the admission of hearsay, which Rule 801 defines as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801, 802. B.G.'s out of court statement to Detective Hawthorne that Bey said that he did not "bust a nut," which the Commonwealth sought to introduce for the truth that B.G. previously made that statement, is clearly hearsay.

Although the trial court permitted Detective Hawthorne to testify to B.G.'s statement as a prior inconsistent statement made by B.G., we agree with Bey that it was inadmissible on that basis. There are two rules of evidence that govern the use of prior inconsistent statements in Pennsylvania – Rule 803.1(1) and Rule 613(a) and (b). Rule 803.1(1) provides:

> The following statements are not excluded by the rule against hearsay if the declarant testifies and is subject to cross-examination about the prior statement:
>
> **(1) Prior Inconsistent Statement of Declarant-Witness.** A prior statement by a declarant-witness that is inconsistent with the declarant-witness's testimony and:
>
> (A) was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition;

(B) is a writing signed and adopted by the declarant; or

(C) is a verbatim contemporaneous electronic, audiotaped, or videotaped recording of an oral statement.

Pa.R.E. 803.1(1). The record reflects that B.G. did not make the statement to Detective Hawthorne under oath, in a writing adopted by her, or on any recording. Thus, this Rule is inapplicable.

Rule 613(a) and (b) states, in relevant part:

**(a) Witness's Prior Inconsistent Statement to Impeach.** A witness may be examined concerning a prior inconsistent statement made by the witness to impeach the witness's credibility. The statement need not be shown or its contents disclosed to the witness at that time, but on request the statement or contents must be shown or disclosed to an adverse party's attorney.

**(b) Extrinsic Evidence of a Witness's Prior Inconsistent Statement.** Unless the interests of justice otherwise require, extrinsic evidence of a witness's prior inconsistent statement is admissible only if, during the examination of the witness,

(1) the statement, if written, is shown to, or if not written, its contents are disclosed to, the witness;

(2) the witness is given an opportunity to explain or deny the making of the statement; and

(3) an adverse party is given an opportunity to question the witness.

Pa.R.E. 613(a)-(b). The record reflects that when the Commonwealth asked B.G. if Bey said anything as he was being pulled off the victim and beaten

up, she said "No." N.T., 10/23-24/13, at 89. B.G. was never confronted with her prior statement to Detective Hawthorne that would have contradicted this testimony, and thus Rule 613 does not permit the admission of the prior inconsistent statement through Detective Hawthorne.

This does not end our inquiry, however, as we must now determine whether this error by the trial court was harmless. ***Commonwealth v. Petroll***, 738 A.2d 993, 1005 (Pa. 1999) (stating once it has been determined that evidence should have been excluded, it must be determined whether the error was harmless). An error will be deemed harmless if:

> (1) the error did not prejudice the defendant or the prejudice was *de minimis;* (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

***Commonwealth v. Chmiel***, 889 A.2d 501, 521 (Pa. 2005) (citation omitted).

In his brief on appeal, Bey concedes that it is likely the admission of this testimony itself "did the defense no harm[] since it admitted no crime." Bey's Brief at 56. Instead, Bey contends that he was prejudiced because "the statement's meaning was never explained to the jurors, thus leaving them free to attach all manner of sinister constructions to it." ***Id.*** The record reflects, however, that Bey never raised that concern or complaint

below, nor did he attempt to elicit testimony defining or explaining the phrase. He objected only to the admission of the statement itself, which was not prejudicial and was cumulative of other, properly admitted evidence. As Bey agrees, his statement that he did not "bust a nut in [the victim]" meant that he did not ejaculate inside of her. Bey's Brief at 56. In his testimony, Bey admitted having sex with the victim and further testified that he did not ejaculate inside the victim. N.T., 10/28-29/13, at 12, 30-31. As the trial court's admission of B.G.'s prior inconsistent statement was harmless, we conclude that Bey is not entitled to a new trial.

In summary, the alleged evidentiary errors do not entitle Bey to a new trial. Based upon our conclusion that the trial court gave Bey an illegal sentence, however, we vacate the judgment of sentence and remand the case for resentencing.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/25/2014

- 16 -